# UNITED STATES DISTRICT COURT
for the
District of Alaska

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Electronic communications in and information associated with the rickwesh@gmail.com email account stored at premises controlled by Google Inc. | ) ) ) ) ) ) Case No. 3:10-mj-00139 JDR |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated here by reference.

located in the ___Northern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated here by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 16 U.S.C. § 3372(a)(1), 3373 (d)(1)(B); 16 U.S.C. §§ 1372(a) (4), 1375(b); 18 U.S.C. § 371 | Unlawful sale of wildlife in violation of federal law; Conspiracy to violate the Lacey Act and the MMPA. |

The application is based on these facts:

See attached Affidavit in Support of Search Warrant.

☑ Continued on the attached sheet.

☑ Delayed notice of __90__ days (give exact ending date if more than 30 days: __01/14/2011__) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Signature Redacted*
*Applicant's signature*

Obe Lowry, Special Agent, USFWS
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10-14-10

/s/Michael A. Thompson, USMJ
Signature Redacted
*Judge's signature*

City and state: Anchorage, Alaska

U.S. Magistrate Judge Michael A. Thompson
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Obe Lowry, being duly sworn, depose and state that:

### BACKGROUND

1. I am a Special Agent with the United States Fish and Wildlife Service (FWS), Office of Law Enforcement, and have been so employed since July 2001. I am presently assigned to the Anchorage, Alaska Field Office. During my employment with the United States Fish & Wildlife Service I have personally conducted numerous investigations involving violations of federal laws, and have assisted other federal agencies with investigations of federal law. Through these investigations I have applied for and served numerous search warrants, including search warrants specific to computers and digital media. I have over seventeen years of law enforcement experience. Prior to my nine years with the FWS, I was employed as a state law enforcement officer in Colorado for about five years and in Utah for about three years.

2. I am submitting this Affidavit under Rule 41 of the Federal Rules of Criminal Procedure in support of an Application for a Search Warrant to search for information associated with a Google Inc. email account rickwesh@gmail.com that is stored at premises owned, maintained, controlled, or operated by Google Inc., an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043. *See* Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Google Inc. to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the account, including the contents of communications.

3. The items to be searched for and seized consist of fruits, evidence and instrumentalities of violations of Title 16, United States Code, Sections 3372(a)(1), 3373(d)(1)(B) (Lacey Act); Title 16, United States Code, Sections 1372(a)(4), 1375(b) (Marine Mammal Protection Act); and Title 18, United States Code, Section 371 (Conspiracy to violate the Lacey Act or the Marine Mammal Protection Act). These items are specifically described in Attachment B, attached hereto.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Facts not set forth herein are not being relied upon in reaching my conclusion that probable cause exists for the issuance of a search warrant. Nor do I request that this

Court rely upon any facts not set forth herein when reviewing this affidavit in support of an application for a search warrant.

5. The FWS is responsible for, among other things, conducting investigations into suspected violations of federal laws and regulations, including those found in the Lacey Act, Title 16, United States Code, Sections 3371-3378, and the Marine Mammal Protection Act, Title 16, United States Code, Sections 1361-1423, as well as other violations of federal law associated with these investigations.

## RELEVANT FEDERAL LAWS

6. The Lacey Act makes it unlawful for a person to knowingly engage in conduct that involves the sale, the offer of sale, or the intent to sell wildlife, including walrus tusks, with a market value over $350.00, including the transport or sale of such wildlife, which has been taken, possessed, transported or sold in violation of a wildlife-related federal law, including the Marine Mammal Protection Act, and which the person knows has been taken, possessed, transported, or sold in violation of a wildlife-related federal law. 16 U.S.C. §§ 3372(a)(1), 3373(d)(1)(B).

7. The Marine Mammal Protection Act makes it unlawful to knowingly transport, purchase, sell, or offer to purchase or sell any marine mammal or marine mammal product, including walrus tusks, in violation of the Marine Mammal Protection Act. 16 U.S.C. §§ 1372(a)(4), 1375(b).

8. The Marine Mammal Protection Act (MMPA) does however provide for exemptions for certain Alaskan natives with respect to the taking and subsequent possession and use of marine mammals and their parts. Specifically the MMPA does not apply with respect to the taking of any marine mammal by any Indian, Aleut, or Eskimo who resides in Alaska and who dwells on the coast of the North Pacific Ocean or the Arctic Ocean if such taking (1) is for subsistence purposes; or (2) is done for purposes of creating and selling authentic native articles of handicrafts, which means items composed wholly or in some significant respect of natural materials and which are produced, decorated, or fashioned in the exercise of traditional native handicrafts; and (3) is not accomplished in a wasteful manner. 16 U.S.C. § 1371(b).

9. 18 U.S.C. § 371, Conspiracy to commit offense or to defraud United States, provides:
      If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.
      If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

## INVESTIGATION

10. Jesse J. Leboeuf is a 46 year old white male living near Glennallen, Alaska. Leboeuf is not Alaskan Native. Leboeuf's birth name is Wayne G. Christian. This investigation has revealed that Jesse Leboeuf and Wayne Christian are the same person. Law enforcement records show that Wayne Christian has a felony conviction dated October 28, 1982 for theft in Spokane, Washington.

11. Leboeuf lives with Loretta A. Sternbach who is a non-coastal dwelling Athabascan Alaskan Native. Leboeuf and Sternbach are not legally married. Leboeuf and Sternbach have an adult son together, William C. Buck, who is a village public safety officer, a commissioned law enforcement officer, in Copper Center, Alaska.

12. I have been acting in an undercover capacity in this investigation since September 3, 2010. I am currently maintaining an ongoing business relationship with Leboeuf in order to gather further evidence. This relationship has assisted me in gathering the following information.

13. Leboeuf claims, and records confirm, that on about July 2, 2010 and again on about August 2, 2010, Leboeuf and Sternbach travelled to Savoonga, Alaska and purchased large amounts of whole walrus ivory tusks.

14. On August 4, 2010, I observed a cargo shipment, from Savoonga, Alaska to Anchorage, Alaska listing Loretta Sternbach as the shipper and receiver. The shipment was manifest as containing 274 pounds of "ivory tusks". I observed a large green duffle, part of the shipment, which appeared by its shape and contour to contain numerous whole walrus tusks. Leboeuf and Sternbach claimed the shipment in Anchorage.

15. On September 2, 2010, I spoke with a dispatcher at Mat-Com Law Enforcement dispatch in Palmer, Alaska to learn that a Colin Paterson, from Dutton, Montana, called requesting information on the legality of buying raw walrus ivory from Jesse Leboeuf. Paterson operates Paterson Custom Knives and has a website on the internet for his knife making business.

16. On September 3, 2010, in an undercover capacity, I spoke with Paterson by phone at the number he gave to Mat-Com dispatch, 406-590-2669. Paterson told me he received a message through his internet website asking if he would be interested in buying walrus ivory tusks. Paterson said the email message was from a "Mike Welsh" and asked that if interested in buying the walrus tusks he should contact "Jesse LEBOEUF at 907-822-3774". Paterson told me that he was interested in using ivory in his custom knife handle business and so he contacted "Jesse" by phone.

17. Your affiant's investigation revealed that the phone number 907-822-3774 is a number subscribed to by Sternbach and used by Leboeuf.

Page 3 of **8**

18. Paterson told me he asked "Jesse" about walrus and mammoth ivory. Paterson said he has used mammoth tusk previously to make knife handles and liked it. "Jesse" told Paterson that he did not have any mammoth tusk left and he would not be getting any until he goes moose hunting again and collects more tusks. "Jesse" told Paterson he had numerous walrus ivory tusks and heads available. Paterson told "Jesse" that he did not want to buy any walrus tusks. Paterson said he asked "Jesse" if it was legal to buy raw walrus ivory.

19. On September 7, 2010, I called Leboeuf in an undercover capacity. During my initial phone call to Leboeuf he told me he had an unlimited supply of walrus ivory tusks for sale. Leboeuf told me he had tasked his "cousin" Rick (now known to be Richard B. Weshenfelder), with the job of marketing the walrus ivory over the internet by emailing potential buyers and asking them to call Leboeuf. Rick was also assigned the task of emailing tracking numbers to buyers in order to assist in tracking the shipments mailed by Leboeuf.

20. Leboeuf told me he gets the walrus ivory from an island which is the walrus ivory capital of the world. Leboeuf said he was selling the walrus ivory tusks for $150 per pound. I agreed to buy 10 pounds of walrus ivory from Leboeuf.

21. While still on the phone, Leboeuf told "Rick" to select three of the best tusks for shipping to me. I asked Leboeuf to ship the 10 pounds of ivory to me at an address in Colorado.

22. Leboeuf then told me that he had shipped walrus ivory to buyers in locations all over the US including North Carolina, Wyoming, Arizona, and Louisiana.

23. Leboeuf explained to me that his wife is an "Eskimo from up north". Leboeuf said that in order to appear legal, when he sells the ivory tusks he includes a letter signed by Sternbach that states the ivory tusk is a gift from Sternbach. Leboeuf said that he then collects the $150 per pound "donation" from the buyer.

24. I gave Leboeuf my email address. Leboeuf told me that he would ship the three tusks out that day and "Rick" would then email me a tracking number for the shipment.

25. On September 7, 2010, I received an email from "Rick W. rickwesh@gmail.com". The email included a US Postal Service tracking number for the package Leboeuf shipped to me in Colorado.

26. On September 8, 2010, I received another email from "Rick W. rickwesh@gmail.com" which contained two photos of large numbers of whole walrus tusks stacked in a room on the floor. The message stated "these are some of the walrus tusks Jesse has available".

Page 4 of 8

27. The shipment was delivered to the Colorado address and I paid Leboeuf the $1,500 for the three whole raw walrus ivory tusks. Also included in the shipment were the three "gift" letters signed by Sternbach as Leboeuf had explained.

28. I replied to the email, rickwesh@gmail.com, and advised that I had received the shipment.

29. On September 10, 2010, I served a Grand Jury subpoena to Google Inc. requesting subscriber information on the email account, rickwesh@gmail.com. Subsequently Google Inc. provided information on subscriber contact information including that Richard B. Weshenfelder was the registered user of rickwesh@gmail.com.

30. On September 24, 2010, I visited Leboeuf, Sternbach, and Weshenfelder at their residence in Glennallen, Alaska. All three individuals lived together in the house. At the residence I observed some 70 or 80 whole walrus tusks. The tusks were tagged with USFWS tags indicating the tusks were taken in 2009 and 2010.

31. At the residence I observed Weshenfelder checking his email on his laptop computer.

32. On October 4, 2010, during another ivory purchase, Leboeuf asked that I deposit the payment into his son's, William Buck's, bank account. Leboeuf told me he had used Buck's bank account to receive money previously, and that Buck, "the law", would be protecting my money.

33. On October 8, 2010, I received a reply email from Weshenfelder advising me that he had been kicked out of Leboeuf and Sternbach's house. Weshenfelder said he was homeless and was told by Sternbach to leave.

34. On October 8, 2010, I called Weshenfelder on his phone and he told me he was threatened by Sternbach that if he said anything about Leboeuf and Sternbach they "would hunt him down". Weshenfelder told me he had been living with Leboeuf and Sternbach since May 2010 for the purpose of "learning to carve".

35. Weshenfelder told me that Sternbach and Leboeuf are now using Sternbach's email account, lsternbach50@hotmail.com, to coordinate their business.

36. Leboeuf, Sternbach, and Weshenfelder have sold me more than 20 tagged, whole, unaltered walrus tusks. The tags on these tusks indicate that the walrus were taken during 2009 and 2010. The sales of these walrus tusks do not fall within the legal exemptions to the provisions of the Marine Mammal Protection Act, and are thus illegal sales for Alaskan Native and non-Alaskan Native alike.

## TECHNICAL BACKGROUND

37. In my training and experience, I know that Google Inc. is a company that provides

free web based Internet electronic mail (email) access to the general public. Google Inc. allows subscribers to obtain email accounts at the domain name gmail.com and that stored electronic communications, including opened and unopened email for Google Inc. subscribers may be located on the computers of Google Inc. Subscribers obtain an account by registering with Google Inc. during which they are asked to provide basic personal information. Consequently, Google Inc. computers are likely to contain stored electronic communications and information concerning subscribers and their use of Google Inc. services, such as account access information, email transaction information, and account application information.

38. In general, an email that is sent to a Google Inc. subscriber is stored in the subscriber's "mail box" on Google Inc. servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on Google Inc. servers indefinitely.

39. When the subscriber sends an email it is initiated at the user's computer, transferred via the Internet to Google Inc. servers, and then transmitted to its end destination. Google Inc. often saves a copy of the email sent. Unless the sender of the email specifically deletes the email from the Google Inc. server, the email can remain on the system indefinitely.

40. A sent or received email typically includes the content of the message, source and destination addresses, the date and time at which the email was sent, and the size and length of the email. If an email user writes a draft message but does not send it, that message may also be saved by Google Inc. but may not include all of these categories of data.

41. A Google Inc. subscriber can also store files, including emails, contact lists, calendar data, pictures, and other files, on servers maintained and/or owned by Google Inc. in conjunction with an email account.

42. Subscribers to Google Inc. might not store on their home computers copies of the emails stored in their Google Inc. account. This is particularly true when they access their Google Inc. account through the web, or if they do not wish to maintain particular emails or files in their residence.

43. In general, email providers like Google Inc. ask each of their subscribers to provide certain personal identifying information when registering for an email account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, and alternative email addresses.

44. Email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the

Page **6** of **8**

Case 3:10-mj-00139-JDR   Document 3   Filed 10/14/10   Page 7 of 12

account (such as logging into the account via Google Inc.'s website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

45. In some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

46. In my training and experience, evidence of who was using an email account may be found in contact lists, email in the account, and attachments to emails, including pictures and files.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

47. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Google Inc. to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, the government will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

48. I submit that there is probable cause to search the computer systems in the control of Google Inc., specifically information associated with the email account rickwesh@gmail.com, described in Attachment A, for the items set forth in Attachment B.

49. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(l)(A). Specifically, the Court is "a district court of the United States ... that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

50. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

FURTHER AFFIANT SAYETH NAUGHT.

Signed: /s/ Signature Redacted
Obe Lowry, Special Agent

Date: 10/14/2010

Subscribed and sworn to before me this 14th day of October, 2010.

/s/Michael A. Thompson, USMJ
Signature Redacted

MICHAEL A. THOMPSON
U.S. MAGISTRATE JUDGE

Case No. 3:10-mj-00139 JDR

ATTACHMENT A

Property to Be Searched

This warrant applies to electronic communications in and information associated with the Google Inc. email account rickwesh@gmail.com that is stored at premises owned, maintained, controlled, or operated by Google Inc., a company headquartered at 1600 Amphitheatre Parkway Mountain View, CA 94043.

(REST OF PAGE INTENTIONALLY LEFT BLANK)

ATTACHMENT B

Particular Things to be Seized

I. **Information to be provided by Google Inc. regarding the email account known as rickwesh@gmail.com:**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google Inc., Google Inc. is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a. The contents of all e-mail stored in the account, including copies of e-mail sent to and from the account, draft e-mail, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail, from June 1, 2010 through and including October 8, 2010;

b. All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, and log files;

c. All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

d. All records pertaining to communications between Google Inc. and any person regarding the account, including contacts with support services and records of actions taken.

## II. Information to be seized by the government

a. All information described above in Section I that constitutes fruits, evidence or instrumentalities of violations of Title 16, United States Code, Sections 3372(a)(1), 3373(d)(1)(B) (Lacey Act); Title 16, United States Code, Sections 1372(a)(4), 1375(b) (Marine Mammal Protection Act); or Title 18, United States Code, Section 371 (Conspiracy to violate the Lacey Act or the Marine Mammal Protection Act), involving Richard Weshenfelder, Jesse Leboeuf, Loretta Sternbach, and/or William Buck, from June 1, 2010 through and including October 8, 2010, including, but not limited to, communications sent and received, calendar entries, draft emails, contacts, and files related to the sale, purchase, transfer, shipping, or collecting of ivory, walrus tusks or ivory tusks, initial contacts, solicitations, efforts to find potential customers, price negotiations, payment information, and contact information for persons or businesses solicited or inquiring about ivory or tusks;

b.  Records relating to who created, used, or communicated with Google Inc. regarding the rickwesh@gmail.com email account or to modify any aspect thereof; and

c.  All records or other information regarding the rickwesh@gmail.com email account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, and log files.

(REST OF PAGE INTENTIONALLY LEFT BLANK)